Next case of the morning is number 230019 SCF Waxler Marine v. The Aris and other vessels. You're Mr. Boone? Yes, ma'am. All right, sir. Good morning. Good morning, Your Honors. Deseret Boone for the appellant, Antoine Morris. I'll be brief because I have to. I only have three minutes. So I just want to hit a few points of contention real quick. Firstly, you know, we're here to say that the court got the district court got it wrong. They got it manifestly wrong. They committed manifest error. They were clearly wrong. Firstly, they were clearly wrong. They committed clear error when they relied almost entirely on the deposition, I'm sorry, the testimony of the defendant's psychiatrist against psychiatrist in dismissing my client's claims for physical injuries  and my client. He actually only spent two and a half hours, up to two and a half hours on one day, three years after the accident, asking my client questions. And they, again, used that to dismiss not only his emotional injury claims but also physical injury claims. My client also saw six other doctors, including one of their doctors, who agreed with our doctor saying that he has sacroilitis. However, that doctor, Dr. Puente, was not put on the stand. And, unfortunately, counsel, before my engagement, failed to subpoena him. But he's replete with the record. And there was a little colloquy with the court and the attorneys addressing that doctor. And his records were specifically omitted, though? His records were not omitted. But there's no doctor who physically examined my client to controvert the evidence that my client had these injuries, other than the word of the psychiatrist who only spoke to my client one day, three years after the accident. So this is not a case of weighing competing evidence. It's not competing evidence. There are six doctors versus one doctor who says that my client had these injuries, my client had PTSD and anxiety and depression. What do we have of the six doctors that's in the record? We have, from Dr. Layekte, who treated him, he was the surgeon, I believe, or orthopedist, excuse me. That's a lot of doctors. Dr. Layekte gave him block injections, which actually the district court, in their judgment, said, well, Mr. Morris failed to have surgery. Well, Mr. Morris has not had a job for three years and does not have $150,000 to have the surgery. So it's only Puente, who is, I think, probably an IME, that wasn't in the record? Correct. All these other doctors are all in the record? Correct. Okay. But my client had the option of having conservative treatment or surgery. And he said, well, I'll go with the conservative treatment because I don't want to do surgery. I'm basically scared to go under. And so they tried the conservative treatment. And Dr. Layekte said, okay, that's not working. Here's an option for surgery. Well, there's no money for surgery. My client testified that had I had $150,000 for the surgery, I would do it. Now, there's some testimony in the record that the surgery was $98,000. But still, my client does not have money for surgery. Let me ask you, just as maybe a relevant point, but didn't he have worker's comp or longshoreman's coverage of some sort? I believe he was getting comp for the first year or two. I'm not actually on his worker's comp side. I'm just wondering because normally that would pay for the medical, not that it would preclude the collateral source rule, but normally that would pay for the medical if he needed it. Well, all his medical was being taken care of by his attorneys. I couldn't really speak to that. I can speak to the bills that I'm still getting. And I can't be responsible for that because I didn't hire them. But, yeah, so I don't know about any bills being paid because they're still being sent to me. Okay. The other thing is Dr. Ginsburg did not actually deny that there was PTSD. He said that it could have resolved itself before he saw me, again, three years after the fact. He also said that the record is complete. He has consistent signs of anxiety and depression in the record and all the other notes. Again, Dr. Ginsburg only saw my client for up to two and a half hours, and that's a liberal estimate, but two to two and a half hours, three years after the fact. And, again, he said the PTSD could have cleared up. He's not sure, but he doesn't think he has it. Why? Because he composes himself on the stand. He can recite what happened, you know, without any hesitation. That, to me, and I'm saying to the court, that it should not bar a finding of PTSD or anxiety because my client did not break down on the stand when the same testimony says I've treated soldiers who had PTSD that was undiagnosed for 17, 18 years, and they were fully functioning. But when it comes to my client, well, he can't function for three years. It just defies logic. The other way that the court was clearly wrong is they made factual determinations in the judgment, and the court didn't really make too many, didn't go into detail with the analysis, but they made factual determinations such as Dr. Graham said that my client's injuries had recovered. Well, Mr. Morris, I hate to say it, but I'm sorry, Mr. Boone, this is a pretty long three minutes. I'm so sorry. If you want to, that's okay, if you want to summarize what, to summarize your final point and then. Well, I'll just make a point on the legal argument for negligence in the zone of danger. But with the zone of danger, we think the court, the district court got it wrong as well. They applied the wrong law. The district court and the, again, they didn't go into too much analysis, but the court and opposing counsel, they framed the zone of danger as if it's like a cone of uncertainty that a meteorologist used to forecast the path of a hurricane. And that's simply not what it is. The zone of danger is not a geographical zone. It is based on the present sense impression of the victim. And simply because the impact did not occur, the Supreme Court has been clear that the tort fugitive cannot escape liability based on the, just because of the fortuity that the physical impact did not occur. And one more thing, this Court has been clear with where it stands with the foreseeability and substantial factor issues. Foreseeability, there's only two things that matter. Number one, was there a general risk? And number two, was there a general class? You don't have to foresee the exact consequence if there's a diverse ways that the risk can happen. And with substantial factor, it's in the brief. We think that this was a substantial factor in his emotional and physical injuries. Thank you for your patience with my comments. Thank you for your time. Uh-oh. Oh, my. Don't worry about it. Everyone else can just bend over a bit. It's okay. So sorry about that, colleagues. Okay. Thank you, Mr. Boone. Next is Mr. McLeod, and you represent Genesis Marine, which is the Elizabeth? Yes. Okay. Good morning, Your Honors. I'm Marty McLeod on behalf of Genesis Marine. We're the Texas-based owner of the Elizabeth Robinson Tug, which was assigned 45% fault for the incident. We are asking the District Court's decision on fault allocation and limitation to be reversed because it committed several legal and factual errors. First, the District Court committed legal error in admitting the previously undisclosed negligence opinion by Valero's expert, Captain Cunningham, and then compounded that error by relying on his opinion in allocating fault. The history is that prior to trial, Cunningham's expert opinions were exclusively focused on the failures of the Greek ship Aris T. Prior to trial, Mr. Cunningham offered no opinions in either his expert report or his deposition testimony regarding fault apportionment among the three vessels. He likewise offered no opinions that the Louisiana-owned tug Loretta or Elizabeth Robinson failed in their duties of care or failed to comply with any inland rules. As I understand it, the main problem for your client here in terms of what happened on the river is that the Elizabeth continued sliding east, contrary to the reasonable expectation of the other parties. And that's what essentially triggered the chain of events. Judge, why was the District Court clearly erroneous in so determining? Okay, so I would refer the Court, that goes to my second argument on the application of the inland rules, if you look at the reconstruction video that's in the record at ROA 23293, and if you look at our track line, which is ROA 2386, Your Honor, it shows exactly how we navigated. This notion that the Elizabeth Robinson with three tugs, when she went around the Honville Bar, which is a relatively sharp bend in the river, that it slid over to the east bank, if you look at the reconstruction video and if you look at the track line, that's not actually what occurred. If you look at actually what occurred when they talk about the navigational data that shows the slide, what that is depicting is not where the vessel is going, but it's the natural downstream maneuver as it goes around the bend. It's naturally sliding as it goes around the bend, but if you look at the actual reconstruction video and if you look at the track line, we stay in the middle of the channel all the way down. But that's the problem because Mr. Christensen kept signaling out, I'm going to back into the berths. So they expected, so the Loretta expected him to be moving to the west. Captain Christensen said he will be backing in into Bayou Fleet, but you have to get around the river bend and navigate the river bend before you can back into Bayou Fleet. Well, that certainly does not come out in the transcript, as the district court quoted it, of the communications. The communications, and if you look at the track line and what actually happened, all of his communications repeatedly that he would be backing, will be, not that I am backing, and Bayou Fleet is below the river bend. It's below the Hanville Bar. So he said that he would be backing, not that I am backing, and if you look at the track line that I just suggested, as soon as he navigated around Hanville Bar, guess what happened? He backed into Bayou Fleet as good as any mariner could. Well, that's not even, that's not shown on the video, actually, right? That's why I referenced the track line, Your Honor, the record site of the track line, because it shows. What is that again? Your Honor, that is, if you look at that, it's record 23886. That shows you exactly how we backed into the fleet, and if you see on the reconstruction video where Bayou Fleet was, then you'll see that that's exactly what happened. He did it, this captain had navigated this river bend at night in High River over 100 times. He had backed into Bayou Fleet before. This was not some new, strange, or unusual maneuver. The issue was is that if you listen on the radio communications that are on the reconstruction video, this notion that the other mariners thought that we were going to be moving over to the fleet is not reflected in the audio transcripts. Does the, what do you mean? Yeah, there's no complaint that he's not going where they thought he was going. This notion, this notion that they expected him to be out of the way, if they expected him to be out of the way, there would have been some radio communications about that. It is a notion, and a legal theory was developed by counsel after this case started. But counsel, the problem is if we go on that one, then we have to say that there was an error in understanding the facts. But if you go on your other argument that it doesn't matter whether the Elizabeth is in the middle or not because the other people have the duty under Rule 9 to give way, even if they see that Elizabeth, even if it had indeed slipped over, which I know you do not believe and you think it stayed the course and did perfectly, they would still have had the duty, especially the heiress T, to have slowed down before it ever got near the, because it could see it all the way, had a clear view of what was going on the whole time. That is exactly right. And that's why we say the district court misconstrued the rules. Because then we don't have to get into a factual error if it's a legal point about how maritime law, right? It is a legal issue about how the rules apply. And I wanted to point out to the court, the district court also did not have the benefit of this Fifth Circuit's recent opinion in DeLoach v. Marine Services, Marquette Transportation Company, 974F3-601, Fifth Circuit, September 11, 2020. It was decided after the trial in this case. And in that case, it made it crystal clear that under Rule 9 and Rule 14, which was at issue in that case, that the downbound vessel has the right of way. And what that means is that the upbound vessel has an affirmative duty to yield. And that's what we're trying to say in this case, is that as the vessel that was being overtaken by the Loretta tug and as a vessel that was coming upriver, downriver against the Aristi, we were the double-edged prism vessels, meaning that the other two vessels had to yield to us. But there's no true judgment about us. So does that mean the truth, even if you're in the wrong spot? Even if you're in the wrong spot, they still have a superior duty to yield, correct? Correct, Your Honor. So it doesn't matter whether you're in the wrong spot. Is that correct under Maritime law? I'm going to ask the other side. I'm sure they'll tell me it's not correct. Generally speaking, it is correct. They have a duty to yield. And what happened is when the Loretta overtook us, it did not yield. It steered toward us and got 20 feet off of our stern. That's because your guy said that they could overtake. Your guy was encouraging them to overtake. The overtaking was a decision that was made by the Loretta. And the Loretta, once it decides to overtake, it can either overtake or not overtake. And once it decides to overtake, it can decide how, when, and where, and has an obligation to do so safely. It is their duty to yield. And the district court kept talking about our duty to tell the Loretta this or our duty to tell the ARIS-T that. But they had the duty to yield to us, and we did not have the obligation to decide how the Loretta and how the ARIS-T met. Well, your fellow was moving, what was it, 400 feet a minute over to the east, to the, yeah, to the east. That is consistently said. We were not moving 400 feet east. As we're going around the river bend. I understand that's the current, but there's still, I mean, I'm not, if you say I'm backing into this bend, and I think they were clearly under the impression, because Sotomayor says at some point later on, I can't, I can't get around, that he's not giving me room. If we would have been sliding 400 feet a minute towards the east bank, we would have hit the east bank. Guess what happened? As per the record reveals, we went right around the bend and ended up backing into Pike Fleet. I do want to finish, because I've only got three minutes left. Again, the two navigation agreements with us and Loretta overtaking us, they've got the duty to yield, we're the privileged vessel. As to the ARIS-T, under this new Deloge case, crystal clear, they've got a duty to yield to us. We don't have a duty as a district court found to tell them what to do. They have a duty to navigate safely, and the reason under Rule 14 and Rule 9 is simple, because as a downbound vessel with a current, you don't have the maneuverability that the upbound vessel has. Do you want to move to the matter of limitation? Yes, I do. I want to make one more point on the overtaking. The district court said that we orchestrated and that we dictated how the ARIS-T and the Loretta were met. We had no obligation to dictate, and we did not dictate. So that factual finding is an error. It's a legal error that's in conclusion. We did not have that obligation. Those statements that we orchestrated had an obligation to dictate is incorrect as a matter of law, as a matter of fact, and is inconsistent with the Deloge case. On the limitation, again, the limitation finding was erroneous for two reasons. Number one, Captain Christensen was not incompetent. If you look at the record, Captain Christensen had a license on his fifth issue, more than 30 years. He had one incident in the past. Under the Fifth Circuit precedent, one incident in the past does not render your captain incompetent. In addition, if you look at the record, the Coast Guard, who has the obligation to revoke and issue suspension proceedings, he did not take any – they investigated the incident, issued a report. They did not assess any findings of fault or take any action against Captain Christensen. But on the other hand, guess what happened? The young pilot on the ARIS-T, he was cited, and the same thing happened to the C-MAX pilot, Sinamo, because he was talking on his cell phone the whole time. And so just to be clear, any notion that under the circumstances, well, we're the double-privileged vessel, that we bear equal fault to CNAC is just clear error. When under Rule 9 and under Rule 13, we were the double-privileged vessel. So we would ask that this Court reverse the district court's finding on allocation of fault, fine the other two parties 90 percent, you know, at whatever relative rate you think is appropriate. Hasn't Judge Ash had some experience with cases like this? Your Honor, with all due respect to Judge Ash, this was the first case he ever tried on the bench. He had been recently appointed. No, I'm not taught as a lawyer. That's my knowledge. He didn't do maritime. He worked at Stone Pigment and was a commercial litigation lawyer. He didn't do maritime. I never had a maritime. I mean, maybe he had a counsel. I've been with Stone Bar for 20 years, and I'm head of their maritime practice. Okay. So, again, one other point. There was also a limitation finding not only on incompetence, but also because our – Genesis approved. Yes, but that maneuver going into Bayou Fleet is something that's done every day. That's not an act of negligence that had any cause in contributing to this casualty. He did exactly what our company policy required, which was before you go into a fleet and you do a downstream maneuver, you call the BGM and you say, okay. And so he complied with the policy. That is not an act of negligence that's sufficient to defeat limitation. And I wish that I had more time, but I appreciate Your Honor's consideration. Thank you. Well, we're studying the briefs carefully, believe me. Okay. Next is Mr. Ryan. You going to leave that there, Your Honor? Well, technically no, but it's your risk. I know we're going to – there went the – I'm going to fix this. There you go. Thank you. Good morning, Your Honor. If you want to take off your – you can – I mean, if you want to leave it on, you may, but it's a lot easier to understand when it's off. I'm Mike Ryan. I'm here for Sinec Marine Services, LLC, and their insurers. And we're here today because the allocation of only 10 percent fault to the ARIS-T was clearly wrong. ARIS-T was a giveaway vessel under several rules, and it didn't give away. Rule 9 required it to slow down to allow the passage to happen. It didn't slow down, not until after it hit the docks. Rule 14 required it to move to the starboard side of the channel, but it kept steaming straight down the middle of the channel, and its pilot said it expected the other vessels to make a hole for him to drive the ship through. Do all the – all the counsel accept the video as being accurate? Yes, Your Honor. Everyone, to my knowledge, accepts that that is an accurate representation. And, Your Honor, just – I wanted to talk about the track line that counsel refers to. That shows the point, only one point of the vessel, but doesn't show the skew or the orientation of the vessel as it goes around the bend. And one of our problems with Genesis – and I'm not really here to talk about Genesis too much – is that they slid – their stern slid way out into the middle of the river, not 400 feet per second, but 400 feet total. If they were in the middle of the river, though, did ARIS-T need to stop or slow down? ARIS-T certainly needed to get over to avoid this. And, you know, my captain was moving to avoid this also. Captain Sanamaw was – as this was sliding 400 feet over, he was moving his tow over at the same time that he is trying to get past in the bend of the river at night in a fog. This is very difficult maneuvering that is going on. And so my problem with the ARIS-T is that Rule 16 requires them to take early and substantial action to stay well clear. Rule 8, which is about avoiding collision, requires positive action in ample time. And what we have here is that ARIS-T did not take positive action in ample time. It waited until the last second, and it took reactionary action. It had to make a severe swerve at the last second, which caused it to oversteer into the docks and go out of control. You think there is some – how would – I mean, did this come out at trial? How would proper navigation of the ARIS-T have avoided this situation? Absolutely, Your Honor. And even – Well, you tell me what the testimony was. Well, there was numerous experts who testified as to what Pilot Leone should have done. The objective evidence that everyone agrees to shows that there is hundreds of feet of river between the ARIS-T and the docks. In fact, there is so much space that 3.5 minutes before the collision, Captain Sano says, we got a situation. Do you want me to tuck in behind the Elizabeth? How about this? How about I cross your bow and go between you and the docks? There is so much room that my guy says, I'm going to cut all the way across your bow and go over there. Or we keep it the way it is. And what does the pilot say? Pilot Leone says, we got plenty of room. Come on. Come on with it. See, I was a little unclear about some of the shortened phrases there. So, well, Your Honor, so my guy is recognizing with 3.5 minutes to go that this is a problem. So 3.5 minutes. But what was the ARIS-T supposed to do in that time? Slow down? Slow down. Move over to starboard a little bit. A little bit. I mean, this was not going to be a T-bone collision or a head-on collision. It was going to be an elision. I understand that. But how close did the ARIS-T end up coming to the Loretta? Tens of feet. Not much. And it's hard to say, Your Honor, because they were both seesawing around each other, which is when you have ships that are 800 feet long and they come to meet each other, they turn out and then they turn back in so that their sterns can go around each other. But let me ask you, but, you know, I mean, your client's in a weird position because the court found that this face wire broke and that your toe suddenly swung out in front of the ARIS-T, requiring the ARIS-T to make a hard to starboard, right? And that's what the court found. And then he found that there was this open mic that ruined Santa Monica communication. Those are elements of fault that could have been found. We would submit that if the evidence in the case, if everybody involved is evaluated, particularly ARIS-T under these rules, and there's no reason for Judge Ash to issue 90 pages of findings of fact and conclusions of law, hundreds of paragraphs long, and then he gets to the ARIS-T and he cites Genesis under these same rules, 1416, 8, 9. He cites us under those same rules and then gets to the ARIS-T. No mention of it. So, yes, Your Honor, those are things that are in the mix, but it has to be a fair mix. Well, what would we do? Would you say that if we found error in the way he had allocated fault, is it up to us to make an allocation? Either for this court to make an allocation or to remain informed. To consider the ARIS-T in light of these clear, clear duties that the ARIS-T didn't follow. And that's what I'm saying is that there's faults in this case to go around, but certainly what the ARIS-T did, being the give-way vessel that doesn't give way and is the only vessel that hits anything that night, causes $42 million worth of damage. Well, it didn't directly cause the other two ships to move, right? No. Well, I mean, except that last maneuver where we tried to pull our stern out of the way by pulling on the face wire with tremendous pressure. The face wire is a Dyneema line that can hold hundreds of thousands of pounds, and you have to pull on it to turn the boat that way. I'm sure. And so when he is fighting for, my client is fighting for his life, he has to pull his stern out of the way so the ARIS-T can get by. And at that time, there was tremendous pressure put on the line and it broke. And there was testimony that it should have been a heavier line and we should have used more lines. But even if the line had not been discarded, there's no expert that can say, oh, well, I took a microscope and looked at the line and can tell within 30 seconds of when this line broke or not. So we would just ask that the court, in fundamental fairness, apply the same rules to everybody, particularly here. I'm not asking for a ticky-tack call. These are the basic fundamental rules of navigation on the Mississippi River that everybody has to abide by. In terms of traffic, this is like evaluating a case on the interstate where you have emerging traffic and someone has a yield sign, and we're not going to talk about the yield sign. There's something I don't understand, probably I should understand, but it has to do with how they didn't put out their anchor whenever they hit the first time, and then they end up hitting much worse the second time because they don't have their – and I understand there's some kind of light or something in the way and there's some kind of – but it seemed to me that there was a miscommunication of whether he was supposed to do the anchor or not because he's asking over and over, and he's like, no. And they're having trouble on that between them. Am I wrong on that? It was definitely not a miscommunication, Your Honor. Okay. There was a question as to whether the anchor was serviceable and could be deployed quickly. There was a survey error. The aristees' interests say a light came crashing down over the anchor and it took a while for them to clear the light so that they could deploy the anchor. But Pilot Leone asked for three and a half minutes for this anchor to be dropped while the aristee was continuing on and on and on to crash. Well, in an earlier – he had asked about it, and he said, no, don't do the anchor. Don't do the anchor. Well, he was still at that point. Yeah, because he wasn't ready yet or something. Well, he could still maneuver to where he couldn't hit the dot. But if they had done the anchor right, would they have hit that second time? I don't think that they would, Your Honor. And is that when – and that's a significant part of the damage, isn't it? Significant part of the damage. And furthermore, Your Honor, the aristee was ballasted down with water so it could get under bridges, the Huey P. Long Bridge, but that was up the river. They could have – and they were going 15 knots through the current, which means 10 knots over ground. So they were going at max speed. They didn't have to be doing that. Your Honor, I've used up all my time. You have rebuttal. I have rebuttal. Thank you, Your Honor. Yes. Okay. We'll hear next from Mr. Letourneau, representing Valero. May it please the Court, Keith Letourneau for VRNO. I'd first like to address the standard of review for the Court, which is clearly erroneous with respect to findings of fact. Negligence, causation, apportionment of fault, and limitation of liability. Factual findings based upon the credibility of witnesses are also afforded even greater deference. And in that Deloach-Marine v. Marquette case, the Court found that we will not second-guess the district court's weighing of the facts, and it is particularly important in a bench trial where the district court's opportunity to judge the witness's credibility weighs strongly. So in this particular case— But do we review de novo the principles, if the Court used the wrong principles or rules of the road, so to speak? Yes, Your Honor, that would be true. That would be true de novo if the Court applied the wrong principles of law, but that was not the case here. Judge Asch was a U.S. Naval surface warfare officer. He fully understood the rules of the road. Well, it's not a dement to — we're not critiquing Judge Asch and his abilities. This is not about Judge Asch. But this is — I'm just asking the legal — some of these are mixed questions of law and fact. You have to get the law right, and then you can do what the facts are. But the judge's decision got the law correct. Okay. He set it out, and then he applied the law to the facts. And because he did so, those require this Court to defer to his rulings with respect to those findings. If that's true, then why wasn't Aris T. analyzed on the different rules that were — would have been violated by them by not yielding? Well, Your Honor, Aris T. was evaluated on those rules, and the judge did find that the Aris T. violated various rules. But it did not. It needed to — it found that it went fast, but it ultimately needed to yield. And it could see the whole time as it unfolded. Well, Your Honor, bear in mind what was happening that night. We're talking about a 4.5-knot current. That's a very strong current on the Mississippi River. The Aris T. has to maintain steerage way while it's on the river. And in order to do that, it needs to maintain its speed. It had to go as fast as it was going? Is that in the record, that it could not have slowed down? Yes, it is. Okay. Where is that? Your Honor, it is with Captain Leone's testimony. And — That he could not have slowed down, because otherwise it would — that's my question. He did testify that he could have slowed down. Okay. But he also testified that the reason he was going the speed he was going was because the vessel was in ballast, but it was trimmed by 15 feet. And that means that the stern of the vessel is 15 feet deeper in the river than the ship. And he testified that created a very stiff feeling with the ship, and he needed greater speed in order to maintain his ability to maneuver the ship. Well, let me ask you, why does Valero care what the allocation of fault is, so long as there's no limitation? Your Honor, Valero does care about the allocation of fault, candidly, because Valero settled out with the Aris T. in advance of the trial. And so it does have a bearing in terms of what the dollar amounts will be that will go to Valero at the end, depending upon what that allocation of fault is. But in terms of that allocation of fault, Judge Ash did not err. What he found was that the primary cause of this incident were the actions of the Elizabeth and the Loretta in engaging in a very risky, overtaking maneuver at night in high water, in a bend in the channel, without knowing that the Aris T. was around the bend, and without knowing where the Aris T. was going to intersect them. Then, coupled with that, those same two vessels, and this is especially exhibited in Exhibit 516, where it shows it's a synced footage of the camera off of the port of the Elizabeth, showing it backing down, synced with Steve Cunningham's reconstruction, showing at that precise moment the Loretta started to fall within the path of the Aris T. The Loretta's stern. The Loretta's stern. And that is something that Synax counsel, in their briefing, omits completely, that it was the Loretta. I didn't see that on the video. Your Honor, if you look at the video, and it's minute 823 on the video, you'll see that the Loretta is parallel to the Elizabeth. And at that point in time, while it was parallel, the Aris T. could have passed safely by. And that is why I believe that Judge Ash chose not to apply the allocation of fault to the Aris T. Because it could have made it. But for the fact that the Loretta fell within the path of the Aris T. If you look at the transcript, which is Exhibit 174, and it's on page number 4, that's exactly when Captain Leone started to make his starboard maneuvers. Those starboard maneuvers were to avoid a catastrophic collision. Well, I know that. That's when the stern. Okay. I just, I'm saying I didn't see it on the video. But if the, the question I asked the other counsel was why couldn't the Aris T. slow down? Your Honor, in this particular case, more than five minutes. It couldn't see that far ahead either. Well, it could see, probably had a better line of sight. But they, all the vessels were within sight of each other. Yeah, but you say there was fog. There was surface fog. Okay. But the fact of the matter is, is that Judge Ash found that the Aris T. should have slowed down, but did not. And he allocated fault to that. But nevertheless, Aris T. still could have safely passed, but for the fact that the Loretta passed basically into its path. That was the critical time during this event. But they were encouraging him. Come on. Come on. Well, Your Honor, bear in mind what Captain Leone kept doing during that, that interchange with Captain Sinamo. He kept telling him, come on, because he didn't want him to fall down. They were both facing the, the current. Aris T. was opposing the current, and the Loretta was being, pushed by that current. If the Loretta started to slow down, then she would be pushed more into the path of the Aris T. Captain Leone kept telling Sinamo, come on with it. Come on with it. You're going to fall down on me if you don't. And that is precisely what happened in this case. That, I think, also is why Judge Ash did not cite Captain Leone for a violation of Rule 8, because he did take action to avoid collision. He was in constant communication with Sinamo about exactly what they needed to do. As soon as he saw Sinamo and Loretta start to fall within his path, he took the evasive maneuvers to starboard. And then you'll notice, very distinctly, he goes port 20. And so he knew that he had avoided the Loretta in order to get around the Loretta. So he took the proper evasive maneuvers at the necessary time. Can we talk about the expert for a second? Yes, Your Honor. Okay. You tendered the expert not on the liability of these other parties, but only on the Aris T? We tendered Captain Cunningham with respect to the video reconstruction. He had also prepared a report addressing the Aris T. But not the other two vessels. That is correct. But it was elicited by the Aris T's counsel what his views were on their responsibilities. That is correct, Your Honor. And, you know, it's very hard to reverse a decision like this, particularly in a bench trial, frankly. But, okay. So at that point, remind me, were there the objections made that it was beyond the scope? There were objections made to that effect. And then they asked for a continuance or something? Or was that later? There was no continuance on it. It was just beyond the scope. But that was shot down? That's correct, Your Honor. And in this particular case, in terms of admissibility of that evidence, and I'm out of time, but let me just finish answering your question. With respect to the admissibility of that evidence, the burden is upon the affected party to establish substantial prejudice. And they had the opportunity post-trial to submit anything that they wanted to Judge Ash addressing that issue. They never did. They did not establish substantial prejudice. Judge Ash did not rely upon that decision or his opinion. The opinion was 20 percent by Mr. Cunningham. Judge Ash found 10 percent. Judge Ash's opinion cited to Mr. Cunningham's report or his testimony four times, three relating to the ectus, one relating to the condition of the vessel, never with respect to liability. And there's nothing in the record that you, not you personally, but they were egged on to get this out there or something, that there was a secret testimony looming that could be beneficial and would also benefit Valero because Valero's already settled. There's nothing about that in the kind of thing that was some kind of gamesmanship. Not at all, Your Honor. Okay. Thank you for your time. The verbal request that the Court affirm Judge Ash's decision in all respects. All right, sir. Okay. Next is Mr. Tedros. And you represent the RST. I do, Your Honor. And I'm expecting a lot of questions from the three of you on that particular issue. May it please the Court, Daniel A. Tedros on behalf of the RST, E&E, and Marmaras Navigation Ltd. Your Honor, if I may start with your last question to Mr. Letourneau. I want to make something very clear. Genesis and CNAC subpoenaed Mr. Cunningham to come in and testify. They wanted the cumulative evidence of alleged RST fault going to the various violations of the safety management system. They were the ones that brought him to the stand and asked him questions. Okay? Mr. Cunningham sat in the courtroom for those 10 days and heard all the experts, heard all the witnesses testify. So on cross-examination, I asked him what I thought was a very fair question. They didn't have a rule in place for the experts or something? I'm sorry. Like we have in Texas the rule, we call it. But he was allowed to sit in the courtroom the whole time? All the experts were, Your Honor. They didn't apply the rule to the experts. Yes, ma'am. And so he heard everyone testify, including the fact witnesses. And so when I asked him, did you evaluate in reaching your conclusions as to the errors, did you evaluate all three vessels, his answer was, of course, yes, I did. Okay? And what was your opinion on the fault? And that's when he said, well, the majority of the fault rests with the other two tongues. That's how that whole thing happened. It was pure cross-examination on my part, and it was allowed by Judge Ash. But usually on cross-examination, you don't ask a question that you don't already know the answer to. Judge, I took a risk that day. And luckily it worked, so. Well, besides that, he said your client was 20%. Correct. So somebody else had to be. Correct. Correct. So if I may, I want to make something very clear. And I think even though there's a lot of issues that we all dispute, I'm fairly certain there's one that none of us dispute, okay? Three pilots, Leone on the Aristide, San Amo on the Loretta, and Christensen on the Elizabeth Robinson, all three believed that this three-wide meeting and overtaking situation could happen safely on the Mississippi River. It happens all the time. They all believed it could happen. They made agreements. They spoke to each other. Those agreements, whether they were contrary to the inland rules or not, they made those agreements. Everyone believed that the other would stick to those agreements. And it wasn't until the last minute when things changed. And something that's critical. So you're basically saying you did not have to give way because you had superseding agreement. Exactly, Your Honor. And if I may, the rules are very clear, okay? Rule 9 says that the vessel proceeding upbound, the Aristide, against the current shall hold as necessary to permit safe passing. It's not a requirement that you have to hold. It's as necessary based on the evaluation of the pilot and his agreement with those tugs. And that's exactly what happened in this situation. But if you hold too much, you lose the ability to steer, if that's the right word. Exactly, Your Honor. And that's exactly what Pilot Leone testified. And I don't want to repeat what Mr. Letourneau already said about how the Aris was down by the stern and up by the bow. But he needed all that power to get up against that current. So in this particular... And what's the effective thing? There was some reference to the ballast because of the bridge. Tell us how that affects this one way or the other. Well, as you know, coming up the Mississippi River, there are three major bridges. So you have to lower the stern of the ocean-going vessel so that all the antennas can get under the bridges. And that's really all that that is. Okay? In this particular case, and contrary to what Senec has said in its brief, the Aris T was not heavy. She was empty. All she was was trimmed by the stern. That was it. Okay? Well, and she was also going 8.9 knots on that video. Against the current. Correct, Your Honor? Correct. While the others were going around 8 or 9, 7 or 8 knots with the current. With the current. Yeah. So you're saying there was no room to slow down? No, I'm not saying that at all, Your Honor. All I'm saying is that... Because your captain admitted he could have slowed down. Absolutely he did. He did admit that. My point, Your Honor, is that Pilot Leone, a very experienced pilot on the Mississippi River, who had piloted over 500 ocean-going vessels in that river, knew the currents, knew how that river's bends and twists go. He made the decision that it was not necessary for him to slow down. That's all I'm saying, Your Honor. And something I really want to point out is that just because they're the privileged vessels doesn't mean that they get to do whatever they want on the river. It just doesn't mean that. It means they have certain responsibilities, and those responsibilities are to follow the agreements they make and or the rules. Effectively, this was a domino effect, okay? And it all was kicked off by the arrogant and cavalier Captain Christensen, whose attitude was evaluated by Judge Ash, was evaluated by all the experts who sat in there, and whose cavalier attitude is what rendered him incompetent in the eyes of the court, okay? He started slowing and backing down his engines and started a starboard flanking maneuver at the worst possible time. He threw his stern right into the Loretta. The Loretta had to go to port to avoid his stern, broke its face wire, and guess what? The Loretta's stern, all of a sudden, was right in front of the ariste. And that's what happened. This is if the Loretta had stayed parallel, and it's shown, in fact, in their reply brief, in Senex's reply brief, if the Loretta had stayed parallel, as depicted here, this incident would not have happened, and it all started with Christensen and the Elizabeth. And that's why the court, having heard from numerous eyewitnesses, crew members, pilot experts, navigation experts, found the two tugs 90 percent at fault. I don't have much time, Your Honors, but I would like to address two quick issues. First, limitation of liability. One thing is for certain, that Judge Asch found that there was no evidence that any act or omission by the Greek crew members on the ariste caused this incident. Okay? Unlike the Elizabeth and the Loretta, the ariste was seaworthy. Well, you know what? Yes, Your Honor. I'm sure that's — I have no quarrel personally with the lack of — with the finding of limitation for ariste, but one thing that is quite graphic to a non-sailor on that video is when your captain starts screaming in Greek, one thing and then the other thing, and he said, Why didn't the anchor go down? Why didn't the anchor go down? Crunch. And then you're moving on. Why didn't the anchor go down? Why didn't the anchor go down? Crunch. And he's still going ahead at three or four knots. Your Honor, I fully appreciate your concern. And luckily for me, I speak fluent Greek, so I could understand everything that he was saying. Well, you know, it looks like a Roadrunner cartoon. Your Honor, with all due respect, that's exactly the opposite. Okay? The crew were running down the deck, trying to get to the anchor. As you know, it's a 783-foot vessel. To get to the front of the vessel, which is where the anchors are, okay, takes time. By the time they got there, they had already made the first contact, and one of the lights, and this was testified to by three members of the crew that were on the front of the vessel when this happened, one of the lights from the terminal started to fall on them. As any one of us, they were afraid for their life. They scurried. And when they had to come back up and start dropping the anchor, that's why it took three minutes or however long it took. It wasn't that the crew didn't know what they were doing or that there was something else nefarious going on. Not at all. So I hope I've addressed that. And as far as the limitation, our crew was well-trained. They were trained in bridge resource management. They were trained in the inland navigation rules. Their captain met with them before they entered the river to talk about that. And most importantly, in the Mississippi River, as many other inland waterways here in the United States, they were trained in the river management rules. And I'm sorry I see my time is up. Go ahead. Well, do they not need to have someone go already to realize that they might need the anchor? Why wouldn't they need to anticipate that? Do they just don't have enough people so you can't move some say, hey, you go down there because we might need to do that? No, ma'am. It would seem like that they should have anticipated that and it shouldn't have taken, you said, oh, it runs 700. It seems like that once it became problematic, you would have had someone go say, we may need to do this, and that would have been a crew duty. That's a very good point, Your Honor. Actually, there's two lookouts that sit up front on anchor duty. You're absolutely correct about that. But these are seamen. They take orders. They have to hear orders from their senior officers to do what they do. They won't just take it upon themselves. So the chief officer was running down there to do all of that. It wasn't a delay that caused this incident or caused the second impact, as Josh Ash found. I'm reading from one of the other briefs, and I feel I need to ask you this, even though your time is technically up. Yes, ma'am. It says, first, at 1940, when the Ares T heard the Loretta and Elizabeth agree to an overtaking that would take place in the bend at mile 126, Pilot Leone or the bridge team should have slowed to permit overtaking to be completed before meeting the downbound tows. Ares T was upbound against the current perenn with plenty of water going over the rudder. She could have maintained control at half a head or less. This precaution would have prevented the incident. And Pilot Leone testified he could have easily slowed down with no issue and even could have stopped the engine if he wanted to do that. Record 6987. Would you like me to address that? Yes. Absolutely. That's exactly what Pilot Leone said. And, Your Honor, what you just read is exactly what Genesis and Senack want this Court to do. Judge Asch evaluated all of that evidence. He also heard Leone say, I spoke to them. I knew what we were going to do. We had agreements. I didn't think it was necessary for me to stop. Now, if Judge Asch found that because of that the Ares T was 10 percent at fault, well, that's – that was his evaluation of the evidence. Okay. May I please, Your Honor, have a minute just to address the Morris issue? No. You've used your time up. We'll take that on the briefs. Thank you for your time. All right. Thank you. Thank you. Mr. Diaz representing Schell. May it please the Court, Tom Diaz representing Schell and Motiva, co-owners of the two docs that were damaged in this elision. I'm going to be very brief in terms of the issues addressed for Schell and Motiva as appellees. Because I believe Mr. Letourneau and Mr. Tadros have very adequately addressed many of the questions that have come from this Court. And frankly, even though Schell and Motiva don't have an interest in terms of the Ares T's percentage at fault because we did not settle with the Ares T prior to trial, I believe and Schell and Motiva believe that the apportionment of fault by Judge Asch is fully supported by the record. And I think what the oral argument here today and two weeks of trial before Judge Asch illustrated amply is that there were probably 12 different opinions, one by every lawyer in that courtroom in terms of what the respective fault of those three vessels were. What does it, why is this the argument that you're making? Because you said it doesn't affect, how does this affect your client? Well, I believe that it should be affirmed. I mean, truly as being open and forthright with the Court, that there absolutely is no clear error out there. And that two weeks of trial, which were very costly for Schell and Motiva. But you said, you pointed out that it doesn't matter what the, how does it matter what the apportionment is? Well, because I believe. You don't want to have to go back and do anything else. Is that the issue? No, not necessarily. Because, frankly, because Mr. Letourneau was being very frank with you that Valera does have an interest in it, I want to take one step back to say as a party that has no interest, we believe that Judge Asch. Well, I want to know what your interests are. She's an app, he's an appellee. Yes. So what is your interest in what the apportionment of the fault is? I don't have one. Okay. But the thing is, though, as an appellee, I submitted a brief and, I believe, provided ample detail of how Judge Asch's opinion is fully supported by the record. Now, I also want, though, to address, Judge Elrod, an issue that you had raised, and that was the issue of the anchor being dropped. And I believe Mr. Tadros has amply described why that there was a delay between the order and the actual falling of the anchor, in part because a light had been dislodged from the Valero dock and hit the portion of the mechanics that is used to drop the anchor. But more importantly, none of the appellants here have raised the issue of intervening superseding cause. No appellant has raised an issue before you saying that a portion of the damages were somehow attributable  I believe so. Well, they're saying no. And normally we don't want people shaking their heads and things. So they're saying no. So is there something that we don't know since you've opened this door? I'm not quite following, Judge, in terms of what you're saying. You get your money no matter how the fault is apportioned, correct? True. And I also believe that it's not like you won't get the money. Right? That's the issue. Well, that remains to be seen. You have every right to argue whatever you want to argue as an appellee. Understood. Yeah. Well, but the issue of the anchor falling, I believe it hasn't been preserved for appealing. Frankly, there was no evidence in the record that said had the anchor been dropped immediately at the time of the order that the second shell dock wouldn't have been hit. So at least that, to me, is an issue that hasn't been preserved for appealing, nor is there any record evidence that it would have made any effect. But a legal issue that I would like to address with you, for which I do think is very significant, is the interlocutory ruling by Judge Zaney on the Crown-Zellerbach issue. And, Judge Jones, I believe you were on the panel when we brought it up on an interlocutory basis, and the court found that there wasn't jurisdiction for an interlocutory review of it. But I think it is worthy of review by this panel because it is a remarkable departure. The trial court had a remarkable departure from Crown-Zellerbach. Okay. But that is only material if we were to find that CNAC could limit its liability, right? Judge Jones, you're absolutely correct. Okay. I just wanted to preface with that. My record amply supports that CNAC, due to the face wires, among other topics that Judge Ash found, cannot limit its liability. However, I do not believe that the trial court ruling should stand unaddressed because it runs afoul of a very complete analysis by Judge Brown that began with his first dissent in Neville Towing, that continued with his dissent to the panel decision in Crown-Zellerbach, and was ultimately solidified in the Crown-Zellerbach en banc ruling in which he clearly said that indemnity language alone, which says that insurance can only attach to the extent an insured has been held liable and pays, is not a provision that provides a personal right, a contractual right, to an insurer to take advantage of limitation of liability. And no policy language has been cited by CNAC's insurers that even remotely suggests that they have a policy defense based on a statute of limitations that can be brought personally by the vessel but cannot be brought by an insurer unless there is readily ascertainable language in an insurance contract in order to assert that right. So what really do you seek? What do you wish us to do? I would like this panel to address that Crown-Zellerbach stands for exactly what it says and that indemnity language alone is insufficient for an insurer to raise a contractual right to limitation because absent addressing that, or even perhaps saying that the issue was brought before the court and the issue will not be addressed because CNAC, and you're expressing no opinion on the veracity or the grounds for which the interlocutory ruling was based. But absent that, as a maritime practitioner, that district court opinion will be raised by insurers at every opportunity because it purports to interpret Crown-Zellerbach but find a conclusion that is diametrically opposed to what Judge Brown found. Do you actually want us to get into whether CNAC is entitled or not? I believe that Judge Ashe's ruling should be affirmed with respect to limitation with CNAC as well as Genesis and that there is evidence in the record and it is far removed from clear error on that issue. And there I do have a vested interest because, if I'm not mistaken, the cumulative amount of the limitation funds for all three vessels do exceed the amount of recovery by Shell and Valero. And so those are issues for which I believe I have a vested interest, Shell and Motiva have a vested interest, and that Judge Ashe has cited to ample evidence in the record that I do not believe and nor should I think this Court should conclude amounts to clear error that the vessels were not entitled to limit. You didn't seek any kind of reconsideration. How is it that the Zaney order came up separately from the rest of this case? It was brought up on a motion for partial summary judgment. Well, I know that. I know how it got to this Court, but how come they weren't both before Judge Ashe? Well, we did not raise it believing that it was law of the case and that Judge Ashe wouldn't be in a position to, because he perceived it. Interlocutory things can always be reconsidered by a new judge. I had looked at, and I'm a little rusty on this, Judge Jones, but I had looked at the law of the case doctrine to see whether Shell, Motiva, and Valero had standing to raise that at trial and believe that we were constrained by the law of the case doctrine and the fortuity that the case had been reassigned from Judge Zaney to Judge Ashe didn't open the door for there to be new legal rulings. But he denied summary judgment, right? Judge Zaney denied summary judgment. Correct, yes. Well, I don't think it's material, but I tend to disagree with your view. But anyway. Even Judge Zaney could reconsider his ruling if it had been before Judge Zaney still. It doesn't matter about whether it changed a judge. If it's interlocutory in that capacity, I don't understand why it couldn't be reconsidered. Well, again, this is just an issue that we had coming into trial on whether it was appropriate to ask a trial court to reconsider a ruling. And Judge Zaney clearly said, and even though it was in the motion for partial summary judgment, he ruled that the CNAC insurers were entitled to limitation of liability to the extent that it was appropriate under the factual circumstances of the case based on indemnity language alone. Thank you. Okay. Well, that will give you something to talk about, Mr. Ryan, in addition to whatever else you were going to on rebuttal. Your Honor, I wish I had the luxury of talking about potentially moot and immaterial issues and issues where I don't have a really monetary dog in the hunt. But I'm here today because my client is aggrieved to the tune of tens of millions of dollars. If you want to take it off here. Thank you. By the outcome of the allocation of faults in this matter. And Mr. Tadros, despite my arguments, which were made repeatedly on behalf of ARIS-T, I didn't hear him address even once why the ARIS-T didn't get over to Starboard and why there was so much river between the ARIS-T and its Starboard side. He talked about this accident being caused by my vessel's failure to stay parallel. The testimony was that my vessel had to kick its stern out in order to be able to kick it back in, in order to seesaw its way around. Now, there is testimony by Captain Schrapp, which I would dispute, because it's based on a grainy CCT video, which I attached in my reply brief, and you can look at it. I couldn't make anything of it. But at any rate, this accident really wasn't caused by the in extremis maneuvers 30 seconds before. This accident was caused by the failure to take timely action, positive action, five minutes before, three-and-a-half minutes before, two-and-a-half minutes before. Pilot Leone said at the 2.5-minute mark, I still was in the middle of the river. This is at 6747. And I could shape over. But he made no steering input for the next two minutes when he says, Starboard 5. Now, two minutes is a long time in the context of any accident, but particularly this one. It's at night on the river. And when he had a country mile, he had two. He had three, four miles in order to simply shape over, and then he would not have to make such aggressive maneuver to miss our. When you say shape over to a non-mariner, what you mean is he just could have pulled over and continued on his course. Is that what you're saying? Well, Your Honor, as you drive a boat around a bend, you know, you want to kind of stay in the middle and not get too close to the sides. But you're anticipating that the bend is coming up. You can't cut it off because there's downbound traffic. So you shape over to the starboard side and you follow the starboard back. You have to go around a little longer way, but there's plenty of depth there. That's where the current is in the river. But you're claiming that he wouldn't have – that the Loretta could have continued to overtake the Elizabeth and he would have just slid on by. Plenty of room. But what about this so-called agreement where he was going to go between them? That was proposed. There was so much room over there, it was recognized by my captain, that he said, hey, RST, what about an option where I cut across and I'm the one who goes over on that side by the dock? So clearly there was enough space for a vessel to get over a little bit in order to create some room for this to happen safely. I can see I'm out of time. Well, who – if we were to look at the record critically, who would be the best expert for your side? Well, I mean, I would say it would be our retained expert, Your Honor. And what was – there were, you know, a legion of experts. What was the name of them? There were so many experts, Your Honor. You forgot his name, too? One, two, three, four, five. I'm not asking you for the – It would be Campana. Huh? Captain Campana, C-A-M-P-A-N-A. Okay. There's one, two, three, four, five, six, seven, eight, nine. There were nine liability experts, Your Honor. And, you know, I mean, leaving due concern with the rules of the road and all that. But okay, well, it's a fascinating case, and we'll be very attentive to all of the writings on it. And with that, I'm sorry to say our hearing today is concluded. Thank you, Your Honor. Thank you.